IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

JEFFREY TODD PIERCE,    )
            )
     Plaintiff,  )
            )
  v.        )   No. CIV-05-1519-C
            )
JOYCE GILCHRIST;    )
ROBERT H. MACY; and THE CITY OF )
OKLAHOMA CITY, OKLAHOMA,  )
            )
     Defendants. )

MEMORANDUM OPINION & ORDER

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, based on alleged

constitutional violations in his arrest, prosecution, conviction, and subsequent incarceration

for the 1985 sexual assault of an Oklahoma City woman.  The case is set for trial in February

2007, and the defendants have individually filed a number of motions for summary judgment.

This order concerns the one made by Defendant Joyce Gilchrist.  For the reasons stated

below, that motion is denied.

STANDARD OF REVIEW

Summary judgment is proper only if the moving party shows "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c).  "An issue of fact is 'material' if under the substantive law

it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144

F.3d 664, 670 (10th Cir. 1998).  "An issue is 'genuine' if there is sufficient evidence on each

side so that a rational trier of fact could resolve the issue either way." Id.  At the summary

judgment stage, the Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  Willis v. Midland Risk Ins. Co., 42 F.3d 607, 611 (10th Cir. 1994).  Thus, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Simms v. Oklahoma ex rel. Dep't of Mental Health, 165 F.3d 1321, 1326 (10th Cir. 1999); McWilliams v. Jefferson County, 463 F.3d. 1113, 1116 (10th Cir. 2006) ("In determining whether any genuine issue as to any material fact exists, evidence is to be liberally construed in favor of the party opposing the motion for summary judgment.").

BACKGROUND

Midday on May 8, 1985, Sandra Burton returned home to her apartment in Northwest Oklahoma City to pick up something she needed for work.  Inside the apartment, she noticed that her and her roommate's bedrooms had been ransacked.  The intruder was still inside the apartment when Burton returned, and he attacked her when he realized she was there.  Burton was raped, orally and anally sodomized, and stabbed in the arm with a meat fork.  Her attacker then, before leaving the apartment, forced her into the shower and instructed her to wash away any incriminating evidence.  Once alone, Burton checked all the doors and windows and called the police.  Burton described her attacker as a white male, who was tanned and had long blond hair, and provided details about his clothing.

On May 8, Plaintiff was working for a landscape company at Burton's apartment complex.  That day, he ate lunch and ran an errand with two other employees.

2

Defendant Joyce Gilchrist joined the Oklahoma City Police Department as a forensic serology chemist after graduating with a B.S. in forensic science from Central State University in Edmond, Oklahoma in 1980.  By late 1986, Gilchrist had been involved in several hundred cases involving either the analysis of bodily fluids, semen, bloodm and/or the microscopic comparison of hairs and fibers.

After at least two unsuccessful efforts to make an identification from a police-prepared photo lineup, Burton identified Plaintiff as her attacker from a three-sheet photo-lineup on February 21, 1986.  On February 28, an Oklahoma County District Judge approved an affidavit and application for arrest warrant and arrest warrant for Plaintiff.  Plaintiff was arrested on March 1.  He signed a waiver that day that allowed Oklahoma City Police Detective Larry Koonce and Gilchrist to search his body and to collect samples of blood, saliva, and hair.  Samples of blood, saliva, and scalp and pubic hairs were collected by either Gilchrist or Koonce at that time.[1]

On March 4, criminal charges were filed against Plaintiff for the Burton attack. Gilchrist claims that as of that date she had "not started or completed her laboratory analysis of the hair or serological evidence."  (Dkt. No. 59, Gilchrist Br. at 4, ¶ 4.)  However, in his deposition, Detective Koonce stated that, during the investigation of Plaintiff, police officer

---

[1] Gilchrist claims that she did not complete her hair analysis until August 13, 1986, and, on March 1, did not perform any analysis of the samples collected that day.  (Gilchrist's Br. at 10, ¶ 2; Gilchrist Aff. at 1, ¶ 1.)  However, there is evidence that during Plaintiff's post-arrest interview with police on March 1, he was told that Gilchrist had matched his hairs to those in the Burton case. (Police Interview of Plaintiff, March 1, 1986, 2 hr. 25-30 min.)  For purposes of summary judgment, this evidence supports Plaintiff's allegation that Gilchrist's first analysis of Plaintiff's hair occurred no later than March 1.

3

Charlie McIntyre took some hair from a brush in Plaintiff's home and that Gilchrist subsequently examined the hair and stated that it "matched" the Burton rapist.  (Koonce Dep. at 58.)  According to Koonce, Gilchrist's finding had some bearing on his belief that Plaintiff was that rapist.  (Id.)  Gilchrist has admitted receiving and examining hairs obtained by McIntyre.  (Boshell Interview at 10-11.)[2]

On March 6, Gilchrist analyzed Plaintiff's saliva and blood and determined that he was a "non-secretor" with an AB blood type.  (Gilchrist Br. at 5, ¶ 5.)[3]  A preliminary hearing was held on March 26.  Based on Burton's testimony alone, the judge determined that there was probable cause to believe Plaintiff committed the crimes charged.  Plaintiff was bound over for trial.

Gilchrist conducted laboratory analysis of hair evidence on July 28, 29, and 30, 1986.[4] Additional scalp hairs were collected from Plaintiff on July 30.  Plaintiff's choice of an

---

[2]  She has also denied conducting any examination of those hairs (Gilchrist Dep. at 217.)

[3]          A secretor is a person who secretes his ABO blood group substances together with H substance into his body fluids (e.g. semen, saliva, vaginal secretion, etc.).  Therefore, an A secretor will secrete A plus H, a B secretor [will secrete] B plus H, an AB secretor [will secrete] A, B and H and an O secretor [will secrete] just H.

(Wraxall/Fedor Report at 4.)

[4]  In addition to Plaintiff's contention that Gilchrist examined hair from Plaintiff's hairbrush before those dates, Richard Bisbing's report refers to laboratory notes dated June 18, 1985, that "reflect[ed] [Gilchrist's] conclusion that bleached hairs from [Burton's] bra (17) were consistent with the suspect's hair and that hairs from the pillow case (24) were consistent with the suspect's hair."  (Bisbing Report at 6.)  Gilchrist's notes from that day are not in the summary judgment evidence.  Bisbing opines that Gilchrist's conclusions were generic, i.e., to be "applied to whoever would be the suspect" because Plaintiff did not provide hair exemplars until March of the following year.  (Id.)

independent lab to review the forensic evidence, the Serological Research Institute ("SERI"), received serological evidence in this case sent by Gilchrist, but no hair evidence, on August 7.

Gilchrist produced her final forensic report on August 26. In that report, Gilchrist found semen present on two rectal swabs, a rectal slide, a skin swab, and Burton's robe.[5] Based on those samples, no ABO blood group substances were detected except for the antigen "H." In two instances Gilchrist identified the enzymes Peptidase A(1), Esterase D (1), and Phosphoglucomutase (1), and in one instance she identified only Phosphoglucomutase (1) in addition to the antigen "H."[6] She found three pubic hairs and 28 scalp hairs taken from Burton's body or clothing or the bedroom as microscopically consistent with Plaintiff's known hairs. Gilchrist also identified Plaintiff's blood type as AB and noted the presence the enzymes PGM (1), ESD (1), and PEPA (2-1). She did not detect any ABO blood group substances in Plaintiff's saliva sample and noted that the ABO blood grouping test results were negative. Gilchrist identified Burton's blood type as O and noted the presence of enzymes PGM (1), ESD (1), and PEPA (1). She detected the ABO secretor blood group substance "H" in Burton's oral wash.

---

[5] Contrary to these findings, in 2001, no spermatozoa was found to be present on one of the rectal swabs, the skin swab, and four slides made from robe cuttings. The absence of spermatozoa was confirmed by Oklahoma City lab scientists and the Oklahoma Bureau of Investigation. (Schile Mem., Feb. 19, 2001; Taylor Report; Keith Report; Marshall Report; Yorkston Report.)

[6] Hereafter, the Court will denote the enzymes Phosphoglucomutase as "PGM", Esterase D as "ESD", and Peptidase A as "PEPA."

An analytical report was prepared by SERI scientist, Gary Harmor, before Plaintiff's trial based on the serological evidence sent by Gilchrist. Harmor did not disagree with any of Gilchrist's analytical results but explained that the genetic profile of the semen donor could not be determined from the evidence examined. "Therefore, the conclusion based on Ms. Gilchrist's data is that any male in the population could be the semen donor." (Harmor Report, Oct. 2, 1986, at 5.)

At trial, Gilchrist testified but her report was not admitted into evidence. She explained to the jury that Plaintiff has an AB blood type and that he is a non-secretor, meaning that he was one of the approximately 20% of the general population whose blood type cannot be detected in non-blood bodily fluids like tears, saliva, or semen in appreciable quantities using the standard "absorption inhibition" test. (Trial Tr. at 13-16.) Blood antigens may be detected in a non-secretor's bodily fluids using an "absorption allusion" test, according to Gilchrist, if the sample is of sufficient quantity. (Id. at 16.)

In contrast to Plaintiff, Burton has an O blood type. Because Gilchrist detected the blood antigen H from Burton's oral wash and saliva samples, she concluded that Burton was a secretor, i.e., a person like approximately 80% of the general population whose blood type can be detected in other bodily fluids such as saliva or vaginal secretions. (Trial Tr. at 13-14). Gilchrist's testimony regarding the blood type and secretor status of Plaintiff and Burton is consistent with statements made in her report. She also stated that the she performed an absorption allusion test to detect the presence of the blood group antigen "H." (Id. at 23; see

also <u>Pierce v. State</u>, 1990 OK CR 7, 786 P.2d 1255, 1263 n.8 (noting that Gilchrist testified that her opinion was based on the amount of antigen found and other factors).)

Subsequently, some of Gilchrist's testimony has been described as misleading and erroneous. (<u>See, e.g.</u>, Wraxall/Fedor Report.) Specifically, Gilchrist repeatedly testified that her findings showed that the semen donor either had an O blood type or was a non-secretor. (<u>See, e.g.</u>, Trial Tr. at 26, 30, 31, 32-33.) However, to make that determination she would have had to have determined the concentration of semen in the analyzed samples. Gilchrist's notes do not indicate that she made any determination of semen concentration (although places in her testimony indicated that she did). According to interpretation rules known and established in 1986, without making such a determination and having a sufficient concentration, the only possible conclusion she could have made was that the semen donor could be any male in the population. However, late in her testimony, Gilchrist went further by stating her opinion that the semen donor was a non-secretor, like Plaintiff. (Trial Tr. at 136.) She also agreed that for Plaintiff to be excluded as a suspect based on forensic evidence, she "would have to have a non[-]secretor that did not have his same identical microscopic hair characteristics. . . ." (<u>Id.</u>) The defense did not call Harmor as a rebuttal expert at trial.

Assuming that Gilchrist's opinion that the semen donor was a non-secretor was scientifically sound, her serological findings, according to one expert retained after Plaintiff's trial, "positively and without question exonerate" Plaintiff. (Wilson Report, Apr. 22, 1987, at 4; <u>see also</u> Wilson Report, Sept. 27, 2006, at 10.) According to this expert, finding the

enzyme PGM 1 in her test of the thigh swab, which presumably was semen from Burton's attacker, means that Plaintiff could not have been the donor because he does not have that enzyme in his bodily fluids.  (Wilson Report, Apr. 22, 1987, at 8.)  As Gilchrist's report indicates, Plaintiff has a different and distinct enzyme in his bodily fluids known as PGM type 2-1.  (Id.)  Secretor status apparently has no bearing on the presence or detectability of genetic markers such as this type of enzyme.  (Id.)  Thus, if Gilchrist had enough material to conclude that the semen donor was a non-secretor (as she must have had to support that conclusion), then there would have been enough material for the PGM enzyme of the attacker to be detected.  (Id. at 9.)  Gilchrist knew that Plaintiff had the PGM type 2-1 enzyme as of March 6, before the preliminary hearing.

At trial, Gilchrist confirmed the hair associations made in her report.[7]  Gilchrist and other experts involved in this case agree that hair analysis cannot positively identify a person but it could exclude someone as a suspect.  (But see Wilson Report, Sept. 27, 2006, at 6 (stating that forensic hair comparisons cannot positively exclude someone as a possible contributor).)  However, in Gilchrist's testimony, she also stated that she had never found two different people whose hairs were exactly alike under the microscope.  In addition, she stated, in support of her associations, that she found a similar unusual banding in Plaintiff's scalp hairs as observed in the unknown hair, that would be consistent with the person having worn a bandana, and that the hairs identified as possibly coming from Plaintiff did not posses

---

[7]  At trial, Gilchrist stated that a total of 28 pubic and scalp hairs could be associated with Plaintiff.  (Trial Tr. at 51.)

even one microscopic inconsistency from his known hair references. (<u>Id.</u> at 51-55.) Forensic experts have since questioned, among other things, Gilchrist's statements regarding the similar banding of Plaintiff's hairs as suggesting that a bandana was worn and that she had never found hairs from different people to be microscopically consistent.[8]

On October 13, the jury found Plaintiff guilty of Rape in the First Degree, Oral Sodomy, Anal Sodomy, Second Degree Burglary, and Assault with a Dangerous Weapon. On appeal, the Oklahoma Court of Criminal Appeals ("OCCA") determined, among other issues, that:  (1) Plaintiff had waived his right to examine the hair evidence before trial (and thus could not complain that not having the opportunity to have an independent evaluation denied him his right to a fair trial) and (2) Plaintiff was not entitled to expand his trial-attack on Gilchrist's credibility on appeal with expert affidavits that Gilchrist's testimony was improper, unfounded, and prejudicial, at least in part because Harmor had examined the

---

[8] Plaintiff complained on appeal that admission of the latter statement was error, to which the Oklahoma Court of Criminal Appeals responded:

> We disagree.  At the outset, we must note that Appellant did not object to the questions in this regard by the prosecutor.  In fact, Appellant brought the issue up a second time when he chose to explore Gilchrist's answer on cross-examination.  Gilchrist testified several times that identification of a suspect could not be based upon hair comparison alone.  She testified that although she had never seen two people with microscopically consistent hair characteristics, the possibility could not be ruled out.  She testified based upon her own experience, as she was asked, and did not cross into the area of statistical probability which we rejected in <u>Brown v. State</u>, 751 P.2d 1078 (Okl. Cr. 1988).  We do not find her testimony to have been misleading or to have overstated the bounds of science.  There is no error here.

<u>Pierce</u>, 1990 OK CR 7, ¶ 37, 786 P.2d at 1265.

serological evidence and the defense made the strategic decision not to call him at trial.  The

OCCA affirmed Plaintiff's conviction and sentence.

On May 7, 2001, Plaintiff was released from prison based on DNA evidence showing

him to be factually innocent.  Earlier in 2001, FBI Supervisory Special Agent Douglas W.

Deedrick examined the hair evidence in this case.  (Deedrick Report.)  Deedrick found that

the pubic hairs recovered from Burton's pubic hair combings and skirt did not exhibit the

same microscopic characteristics as Plaintiff's known pubic hairs.  Several of the 28 scalp

hair associations were also reviewed, and none of those could be associated with Plaintiff's

known hair samples.  Another expert similarly concluded that none of the questioned hairs

from the Burton case, upon microscopic examination, could be associated with Plaintiff.

(Bisbing Report.)  The differences between Plaintiff's hairs and those Gilchrist associated

with him should have been obvious.  (Id. at 5-6 ("The questioned hairs are different from

Pierce's hair, they could not have come from Pierce, and there should have been no

mistaking that fact, if they had been objectively compared."); see also Wilson Report, Sept.

27, 2006, at 4 ("Only in the case of Ms. Gilchrist have I personally observed hair

comparisons that were clearly not similar as being reported to be similar.").)

DISCUSSION

Gilchrist makes the following arguments in her motion for summary judgment:  (1)

there is no evidence of any alleged constitutional violation; (2)  Plaintiff's § 1983 claims are

barred by the doctrine of collateral estoppel; (3) she is entitled to absolute immunity for her

trial testimony; and (4) she is entitled to qualified immunity for her non-testimonial conduct. These contentions and Plaintiff's responses are addressed below.

A.   *Evidence of Constitutional Violations*

Section 1983 provides a cause of action against someone who, while acting under color of state law, violates a federally-protected right and, under certain circumstances, the municipal employer and/or supervisor of such a person. See 42 U.S.C. § 1983.  In a prior action involving an identical complaint, Case No. CIV-02-509-C, the Tenth Circuit described Plaintiff's allegations as implicating "the Fourth Amendment right to be free from unreasonable seizures" and "the Fourteenth Amendment right not to be deprived of liberty without due process of law, or more specifically, as the result of the fabrication of evidence by a government officer acting in an investigative capacity." Pierce v. Gilchrist, 359 F.3d 1279, 1285 (10th Cir. 2004). To prove his claims against Gilchrist, Plaintiff must show, among other things, that Gilchrist's falsification of inculpatory evidence and/or suppression of exculpatory evidence was necessary to the finding of probable cause.  Id. at 1295. Gilchrist now argues that Plaintiff has no evidence that she falsified inculpatory evidence or suppressed exculpatory evidence that was necessary to a finding of probable cause.  The Court does not agree.

There is evidence that indicates Gilchrist associated hairs taken by a police officer from Plaintiff's home with unknown hairs from the Burton case and that Gilchrist's finding contributed to at least one detective's belief that Plaintiff was guilty of those crimes. Although the timing of these events is not clear, they may well have occurred before

11

Plaintiff's arrest.  The jury could credit expert testimony that none of the hairs subsequently taken from Plaintiff (on March 1 and July 30) could be associated with hairs recovered in the Burton case and find that any earlier match by Gilchrist was similarly falsely inculpatory. Further, the jury could reasonably find, again based on expert testimony, that Plaintiff's hair and those recovered in the Burton case are sufficiently dissimilar that he should have been excluded as a possible suspect on that basis.  Thus, an issue of fact exists as to whether Gilchrist suppressed exculpatory information prior to Plaintiff's arrest and thereafter.

Both sides acknowledge that in a case involving the withholding of exculpatory evidence, the existence of probable cause is determined by examining the evidence as if the omitted information had been included.  Although a victim's identification is normally sufficient to support a finding of probable cause, the Court finds, as a matter of law, that it would not be when considered together with forensic evidence that unquestionably excludes the suspect.  Plaintiff has also produced evidence that the district attorney's office would not have proceeded with a prosecution under such circumstances.  (Macy Dep. at 140-45, 150.) Thus, Taylor v. Meacham, 82 F.3d 1556 (10th Cir. 1996), and other cases on which Gilchrist relies for their holding that a finding of probable cause at a preliminary hearing precludes claims based on prior constitutional violations in the arrest and detention are inapplicable.[9]

---

[9] In Taylor, there was no allegation that the sheriff did anything improper post-arrest. 82 F.3d at 1563.  After finding that there was probable cause for the arrest, the circuit examined the plaintiff's claim that his Fourth Amendment rights were violated during his seven-week incarceration following his arrest.  Id.  It was in this context that the court explained that an indictment or a preliminary hearing before an impartial judge could break "the chain of causation" set in motion by a wrongful arrest–a possible first step towards a malicious prosecution. Id. at 1564. However, the court recognized that the rule would not apply if the arresting officer made false or

In this case there is evidence that both the hair and serological evidence independently could have excluded Plaintiff as a suspect.  Thus, there is sufficient evidence in the record to warrant a trial on all of Plaintiff's Fourth and Fourteenth Amendment claims.[10]

In contrast, Plaintiff has made no effort to respond to challenges to his allegations of a Fifth and Eighth Amendment violation by Gilchrist.  Thus, summary judgment is granted in Gilchrist's favor on Plaintiff's claims based on those amendments.

B.    *Collateral Estoppel*

Gilchrist also argues that Plaintiff is barred from litigating his Fourth and Fourteenth Amendment claims because proof of those claims would require findings of fact or law

---

misleading statements after the arrest or somehow caused false or perjured testimony to be presented at the preliminary hearing.  Id. at 1563.

Here, in addition to Gilchrist failing to ever disclose the exculpatory hair analysis, Plaintiff has evidence that the serological evidence analyzed by her excluded Plaintiff as a suspect.  Thus, even if Gilchrist did not examine Plaintiff's hairs prior to his arrest–so that there would have been probable cause for arrest based on Burton's identification–she does not deny that the serological information that Plaintiff's expert claims excluded Plaintiff was in her possession before the preliminary hearing.  It is also undisputed that she consistently maintained that Plaintiff could have been the semen donor.  Based on this evidence, as construed in the light most favorable to Plaintiff, the judicial determination of probable cause at the preliminary hearing is not a bar to Plaintiff's claims.

[10] Gilchrist's opening brief focused on the lack of evidence, in her view, of any wrongdoing on her part (i.e., false or fraudulent analysis or statements and/or withholding of exculpatory evidence).  In her reply brief, Gilchrist complains that Plaintiff also has no evidence to "show that the alleged fabricated evidence caused a deprivation of [his] constitutional rights."  (Dkt. No. 105, Gilchrist Reply Br. at 4 (emphasis removed).)  Although the Court recognizes that Plaintiff bears a heavy burden at trial of showing that Gilchrist was instrumental in his being arrested, prosecuted, and/or confined, Plaintiff has produced sufficient evidence at summary judgment to allow him to present his claims to a jury.  Specifically, Detective Koonce testified that Gilchrist's hair match had some influence on his belief of Plaintiff's guilt, and the District Attorney has testified that he likely would not have pursued or continued a prosecution in the face of forensic evidence excluding someone as a possible suspect.  Based on this and the other evidence in the record, a jury could reasonably find that Gilchrist played an "instrumental" role at each stage of the criminal process.

contrary to those decided by the OCCA in Plaintiff's appeal.  The doctrine of collateral estoppel, or issue preclusion, can bar § 1983 claims in some instances.  See Allen v. McCurry, 449 U.S. 90, 105 (1980).  "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  Id. at 94. Although the Court applies Oklahoma law on collateral estoppel because that is the state in which the earlier litigation occurred,  Kinslow v. Ratzlaff, 158 F.3d 1104, 1105 (10th Cir. 1998), Oklahoma law and federal law are the same, Fulsom Construction Co. Inc. v. United States Fidelity and Guaranty Co., 2005 WL 2542860, at *3 (10th Cir. Oct. 12, 2005) (citing Robinson v. Volkswagenwerk AG, 56 F.3d 1268, 1273 n.3 (10th Cir. 1995))[11].

The Restatement (Second) of Judgments § 27 (1982) defines the collateral estoppel doctrine:  "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."  Under Oklahoma law, collateral estoppel has four requirements:

> "'[T]he issue sought to be precluded must be the same as that involved in the prior judicial proceeding; the issue was litigated in the prior action; the issue was in fact actually determined in the prior proceeding; and the determination of that issue was necessary to support the judgment in the prior proceeding.'"

Franklin v. Thompson, 981 F.2d 1168, 1170 (10th Cir. 1992) (citation omitted); see also Dodge v. Cotter Corp., 203 F.3d 1190, 1198 (10th Cir. 2000) (identifying similar collateral

---

[11]  This unpublished opinion is cited in accordance with Tenth Circuit Rule 36.3.

estoppel elements).   In accord with the general rule and the preceding requirements, the

Oklahoma Supreme Court has reiterated:

> [I]issue preclusion applies only to those issues actually adjudicated and
> necessary or essential to the prior judgment. The party relying on a claim of
> issue preclusion bears the burden of establishing that the prior litigation has
> actually determined the question of fact sought to be precluded.  The test is
> whether the question of fact in issue in the second action is a question which
> was actually determined in the first adjudication.

Carris v. John R. Thomas & Assocs., P.C., 1995 OK 33, ¶ 11, 896 P.2d 522, 528 (footnotes

omitted).  Oklahoma also specifically requires the party barred from relitigating an issue have

had a "full and fair opportunity" to litigate that issue in a prior action.  Fent v. Okla. Nat. Gas

Co., 1994 OK 108,

¶ 15, 898 P.2d 126, 133.

Here, Gilchrist's argument rests on the OCCA's determination that Plaintiff waived

his right to an independent examination of the hair evidence and that he could not, on appeal,

attack Gilchrist's credibility with expert affidavits when the serological evidence on which

those affidavits were partially based was available at trial and one of those experts was

prepared to testify at trial.  The Court finds Gilchrist's argument without merit because it

would require preclusion of factual issues that were not actually litigated.  Both of the OCCA

rulings, as summarized above, boil down to Plaintiff having had an opportunity to present

evidence or argument at trial but failing to do so.  The underlying and pertinent issue in this

case, whether Gilchrist's conclusions were falsely inculpatory and/or she withheld

exculpatory information, were not actually litigated at trial or on appeal.  To the contrary,

that Plaintiff *could have had* a full and opportunity to litigate whether Gilchrist's analysis of forensic evidence falsely inculpated him and/or suppressed the truth that he could not have been Burton's attacker does not, as Gilchrist argues, equate to *having had* a full and fair opportunity to vet those questions before a jury.  See, e.g., 47 Am. Jur. 2d Judgments § 493 (2006) (explaining that collateral estoppel does not apply to matters that might or could have been litigated but were not).  Nor does it equate to the conclusion that the answer would have been negative if he had.

In sum, Gilchrist has not established that under Oklahoma law collateral estoppel applies to an issue previously waived.  See Diamond v. Howd, 288 F.3d 932, 935-36 (6th Cir. 2002) (holding that waiver of preliminary hearing did not waive right to subsequently challenge lack of probable cause as a Fourth Amendment violation in a 1983 action); 18 Charles Allen Wright et al., Federal Practice and Procedure § 4419 (2006) (observing that the waiver approach in the collateral estoppel context is questionable).[12]  Thus, Gilchrist's collateral estoppel argument is rejected.[13]

It is also worth noting that Gilchrist's reliance on Johnson v. Mahoney, 424 F.3d 83 (1st Cir. 2005), is misplaced.  In Johnson, the exculpatory evidence withheld from the

---

[12] To the extent that the impeachment efforts made at trial might constitute actual litigation of the broad issue of Gilchrist's credibility, Plaintiff's conviction did not necessarily hinge on the jury finding her to be credible.  It is agreed that Burton's testimony alone was sufficient to support Plaintiff's conviction, absent compelling evidence challenging the identification.  Thus, a finding that Gilchrist was credible was not essential or necessary to any state court judgment.

[13] Having decided that the doctrine of collateral estoppel does not apply, the Court need not consider Plaintiff's argument that there is no final judgment because his conviction was overturned.

defense was police reports containing the defendant's own statements that he was at home at the time of the murder for which he was being prosecuted.  The prosecutor located and turned over those reports the day before the Commonwealth rested its case in the defendant's second trial.  The defendant was convicted, and on appeal, the Massachusetts Supreme Judicial Court held that the defendant was not prejudiced by the Commonwealth's failure to produce those reports earlier.  After being exonerated some years later, the defendant filed a § 1983 action alleging constitutional violations in the withholding of evidence and interfering with counsel's ability to present a defense (i.e., decide whether to present certain witnesses at trial).

The First Circuit determined that summary judgment in the defending officers' favor was supported by the doctrine of collateral estoppel.  Because prejudice was a necessary element to the constitutional claims, the prior finding that the defendant was not prejudiced by the withholding of evidence was fatal.  In contrast, Gilchrist's attempt to equate a specific no-prejudice finding, based on facts not present or analogous to those in this case, to the OCCA's determination of no reversible error goes too far.  The OCCA did not find that Plaintiff was not prejudiced, but only that he had waived certain opportunities and arguments.  Thus, for the reasons already stated, the OCCA's findings and legal conclusions do not have the same preclusive effect on Plaintiff's claims.[14]

_____

[14] Gilchrist's final collateral estoppel argument, that the alleged constitutional violations were self-inflicted due to trial counsel's waiver of his right to examine the hair evidence, is without support.  Gilchrist offers no authority to support this argument except for the text of § 1983, which requires that the person acting under color of state law subject a citizen or cause that citizen to be subjected to a deprivation of a federally-protected right.  Plaintiff might have caught Gilchrist's

C.    *Immunity*

Finally, Gilchrist argues both that she is entitled to absolute immunity with respect to her trial testimony and qualified immunity with respect to her non-testimonial acts.  These issues have been previously addressed by this Court in a predecessor case in the motion to dismiss context and affirmed on appeal.  Therefore, extensive discussion is not necessary.

Gilchrist is correct that she is entitled to absolute immunity for her in-court testimony at Plaintiff's trial, meaning she is not subject to civil liability for that testimony even if it was perjured and/or resulted in an unconstitutional deprivation of Plaintiff's rights.  See Briscoe v. LaHue, 460 U.S. 325, 330-31 (1983).  However, she has not satisfied the Court that her testimony may not be considered for any purpose, such as evidence of what statements she may have made to the district attorney's office in the course of the investigation and prosecution of Plaintiff.  Therefore, the Court finds no error in Plaintiff's experts referencing Gilchrist's testimony in their reports.  (See Gilchrist's Br. at 25 ("Gilchrist anticipates that Pierce, in violation of the Absolute Witness Immunity Doctrine, will attempt to establish that her testimony was false and without scientific basis through the use of his six named experts. . . .").)

Gilchrist's contention that she is entitled to summary judgment for constitutional violations based on her non-testimonial acts because of qualified immunity is without merit.

---

alleged lies and damning omissions earlier with more diligent counsel or a different defense strategy, but he cannot fairly be said to have caused the liberty and due process deprivations flowing from Gilchrist's alleged actions in the first instance.

> "Qualified immunity is designed to shield public officials from liability and ensure that erroneous suits do not even go to trial." Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995) (quotation omitted). When a defendant bases a motion for summary judgment on the defense of qualified immunity, the plaintiff must show that the defendant's actions violated a specific statutory or constitutional right, and that "the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." Id.

Steffey v. Orman, 461 F.3d 1218, 1221 (10th Cir. 2006). Notwithstanding Gilchrist's arguments to the contrary, Plaintiff has satisfied both of these requirements for purposes of surviving summary judgment.

First, there is evidence raising genuine issues of material fact with respect to whether Plaintiff's arrest, prosecution, and/or post-conviction confinement were constitutionally defective. Above, the Court outlined the evidence indicating that Gilchrist took actions that contributed to Plaintiff's arrest; identified the expert evidence indicating that Gilchrist's findings, contained in her final report and, as indicated by her trial testimony, possibly communicated verbally, were falsely inculpatory and should have excluded Plaintiff as a suspect; and decided that collateral estoppel does not bar any of Plaintiff's claims. Thus, there is evidence to support Plaintiff's claims that Gilchrist violated his constitutional rights.

Second, there is no question that the law with respect to the constitutional violations alleged here was clearly established in 1986.

> No one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest. . .

[Similarly,] [l]ong before the events in question, the Supreme Court held that a defendant's due process rights are implicated when the state knowingly uses false testimony to obtain a conviction . . . or withholds exculpatory evidence from the defense . . . .

[Thus, the Tenth Circuit has] no doubt that, in light of these holdings, an official in Ms. Gilchrist's position in 1986 had "fair warning" that the deliberate or reckless falsification or omission of evidence was a constitutional violation–even though the arrest had already occurred.  There is no moral, constitutional, common law, or common sense difference between providing phony evidence in support of an arrest and providing phony evidence in support of continued confinement and prosecution.  Even if there were no case directly on point imposing liability on officials whose falsification of evidence occurred at the post-arrest stage, an official in Ms. Gilchrist's position could not have labored under any misapprehension that the knowing or reckless falsification and omission of evidence was objectively reasonable.

Qualified immunity is designed to protect public officials who act in good faith, on the basis of objectively reasonable understandings of the law at the time of their actions, from personal liability on account of later-announced, evolving constitutional norms.  Ms. Gilchrist's alleged misconduct did not stem from a miscalculation of her constitutional duties, nor was it undertaken in furtherance of legitimate public purposes that went awry.  Rather, as alleged, Ms. Gilchrist engaged in a deliberate attempt to ensure the prosecution and conviction of an innocent man.  Such conduct, if it can be proven at trial, violated Mr. Pierce's constitutional rights with "obvious clarity."

Pierce, 359 F.3d at 1298-1300.  Under the circumstances, Gilchrist is not entitled to summary judgment because of qualified immunity.

CONCLUSION

Accordingly, Gilchrist's motion for summary judgment (Dkt. No. 59) is DENIED in part and GRANTED in part.  Having been dismissed in a prior suit, Plaintiff's § 1983 claim based directly on Gilchrist's trial testimony will not be tried.  Summary judgment is granted

20

in Gilchrist's favor on Plaintiff's Fifth and Eighth Amendment claims.  All other claims

remain for trial.

IT IS SO ORDERED this 16th day of January, 2007.


_____
ROBIN J. CAUTHRON
United States District Judge