IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JEFFREY TODD PIERCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CIV-05-1519-C |
| | ) | |
| JOYCE GILCHRIST; | ) | |
| ROBERT H. MACY; and THE CITY OF | ) | |
| OKLAHOMA CITY, OKLAHOMA, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Defendant City of Oklahoma City has moved for summary judgment on Plaintiff's

claims against it.  Response and reply briefs have been filed.  The Court has already

addressed arguments and issues related to the City's motion in its order on Defendant Joyce

Gilchrist's motion for summary judgment as well as in orders on defense objections to

Plaintiff's proposed expert witnesses.  (See Dkt. Nos. 107-110, Orders.)  Against this

backdrop and for the reasons stated below, the City's motion is granted in part and denied

in part.

STANDARD OF REVIEW

Summary judgment is proper only if the moving party shows "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  "An issue of fact is 'material' if under the substantive law

it is essential to the proper disposition of the claim."  Adler v. Wal-Mart Stores, Inc., 144

F.3d 664, 670 (10th Cir. 1998). "An issue is 'genuine' if there is sufficient evidence on each

side so that a rational trier of fact could resolve the issue either way." Id. At the summary

judgment stage, the Court's function is not to weigh the evidence but to determine whether

there is a genuine issue for trial. Willis v. Midland Risk Ins. Co., 42 F.3d 607, 611 (10th Cir.

1994). Thus, the Court views the evidence in the light most favorable to the nonmoving

party and draws all reasonable inferences in that party's favor. See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986); Simms v. Oklahoma ex rel. Dep't of Mental Health,

165 F.3d 1321, 1326 (10th Cir. 1999); McWilliams v. Jefferson County, 463 F.3d. 1113,

1116 (10th Cir. 2006) ("In determining whether any genuine issue as to any material fact

exists, evidence is to be liberally construed in favor of the party opposing the motion for

summary judgment.").

BACKGROUND

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, based on alleged

constitutional violations in his arrest, prosecution, conviction, and subsequent incarceration

for the 1985 sexual assault of an Oklahoma City woman, Sandra Burton. Burton was raped,

orally and anally sodomized, and stabbed in the arm with a meat fork in her northwest

Oklahoma City apartment around noon on May 8, 1985. Plaintiff was working for a

landscape company at Burton's apartment complex on that day.

On February 21, 1986, Burton identified Plaintiff as her attacker from a photo-lineup.

An Oklahoma County District Judge approved an affidavit and application for arrest warrant

and arrest warrant for Plaintiff on February 28, and Plaintiff was arrested on March 1. On

March 4, criminal charges were filed against Plaintiff for the Burton attack. In October,

2

Plaintiff was convicted of Rape in the First Degree, Oral Sodomy, Anal Sodomy, Second Degree Burglary and Assault with a Dangerous Weapon.  After being incarcerated for more than 14 years, Plaintiff was released from prison on May 7, 2001, based on DNA evidence showing him to be factually innocent.

Additional evidence related to the investigation and prosecution of Plaintiff is detailed in the Gilchrist summary judgment order.  In sum, Gilchrist was the Oklahoma City Police Department's forensic chemist who worked on the Burton case.  She analyzed hair, fiber, and serological evidence, including samples taken from Plaintiff, and concluded that Plaintiff could not be excluded as a suspect.  Gilchrist had been employed with the Oklahoma City Police Department since graduating with a B.S. in forensic science from Central State University in Edmond, Oklahoma, in 1980.  Plaintiff produced expert evidence that the hair and serological evidence, independently, should have excluded Plaintiff as a possible suspect if it was properly analyzed.  Construing the evidence in Plaintiff's favor, the Court held that Plaintiff survived summary judgment on his Fourth and Fourteenth Amendment claims against Gilchrist for withholding exculpatory information and supplying falsely inculpatory information that was critical to a finding of probable cause at every stage of the criminal process.  The Court also rejected Gilchrist's argument that Plaintiff's claims are barred by the doctrine of collateral estoppel because of the Oklahoma Court of Criminal Appeal's decision in Plaintiff's criminal case.  These matters are not given further treatment herein.

For purposes of the City's potential liability as Gilchrist's municipal employer, the key evidence concerns the City's training, supervision, and control of forensic chemists in

3

the early 1980s and, to some extent, for its post-1986 reaction to concerns raised about Gilchrist's work quality and competence.

A.       *Initial Training*

The City's initial training of Gilchrist consisted of sending her to courses put on by institutions respected in the field of forensic science and placing her on a nine month "training period" during which a supervising chemist, Janice Davis, would periodically discuss and check her work.[1]   In August 1980, Gilchrist attended the Advanced Electrophoretic Techniques of Blood Stain Analysis in Forensic Serology course, taught by the Serological Research Institute ("SERI").   From January 11 through February 6, 1981, Gilchrist received training regarding the "sciences of blood, hair and fiber analysis" at the FBI Academy.   (Dkt. No. 31, City's Br. at 1, ¶ 3.)   In February 1981, she attended the

---

[1] Gilchrist completed an internship with the Oklahoma City Police Department as a degree requirement.  (Gilchrist Dep. at 41.)  After she was hired, she continued her training.  (Id. at 42.) Gilchrist explained that her training period lasted approximately nine months (starting during her internship in February 1980), but that she was not given her any of her own cases to work until mid-1981.  (Id. at 42-43.)  It would appear that Gilchrist's training period was longer than nine months considering that she did not work a case independently until mid-1981, more than a year after beginning her internship.  However, both sides refer to her on-the-job training as lasting nine months.  (See, e.g., Dkt. No. 46, City's Reply at 8.)  Thus, the Court will as well.

In describing the training she received on-the-job with respect to hair analysis, Gilchrist explained that Davis gave her prepared slides to examine and that Davis would then review her notes, ask her questions, and discuss what she saw under the microscope and what she should be looking for.  (Gilchrist Dep. 43-46.)  Davis continued to review Gilchrist's comparisons until they both felt comfortable that she was capable of working independently, which occurred in mid-1981. (Id. at 47.)

Another chemists who joined the Oklahoma City Police Department lab in 1982 described the on-the-job training she received:  "On-the-job training encompassed, first, reading every book they handed you, but then working with, specifically, Janice Davis, side by side as she would process evidence, inventory evidence, and do the various analysis that we did in that laboratory on case work."  (Keith Dep. at 25.)

Electrophoretic Techniques of Semen Analysis in Forensic Serology course, also taught by SERI.[2]

During these courses, Gilchrist was instructed, among other things, that: hair comparisons do not constitute a basis for positive personal identification, even though it is rare to see hairs from different people exhibiting the same microscopic characteristics; and a chemist must unsympathetically testify to the results and not offer personal opinions.

Gilchrist also apparently received additional training materials from the District Attorney's Office and the Oklahoma City Police Department throughout the early 1980s. These materials, in part, explained: that a witness must answer truthfully the questions a defense attorney asks (City's Ex. 17); a witness's testimony is important and "'determines the outcome of the case'" (City's Br. at 4, ¶ 4) (quoting City's Ex. 18)); the witness should conduct a proper and complete investigation, thoroughly record the results of the investigation, refresh his or her memory before appearing in court, behave professionally, listen and think before speaking, and always tell the truth (City's Ex. 19); the chemist analyzes all physical evidence submitted to determine the presence of semen, blood, hairs and/or fibers that may connect the defendant to the victim, and other trace evidence that may corroborate the victim's story (City's Ex. 20); and the results of tests may be exculpatory (id.).

_____

[2] Gilchrist also periodically attended police training programs beginning in 1980 and continuing throughout her employment with the City. (Gilchrist Resume at 3-4.) With respect to additional forensic training by outside institutions in the early years of her employment, Gilchrist attended the Forensic Science Workshop in 1984 and an International Symposium on Forensic Hair Comparisons in 1985, both of which were put on by the FBI. (Id. at 4.)

B.        *Subsequent Supervision and Control*

Following her initial training, Gilchrist's work was not reviewed unless she asked for another chemist's opinion.  (See Gilchrist Dep. at 48.)   In the early 1980s, the City recognized a need for "peer review" in the lab, but commanding officers did not insist upon it.[3]  Gilchrist's superiors also did not insist that chemists submit to proficiency or skills tests.[4] And no policy or practice existed of monitoring their testimony.  There is expert evidence that peer review, proficiency tests, and a "pro-active program" for monitoring testimony was commonplace or standard practice in the mid-1980s and that these measures were important to the operation and integrity of a forensic lab.  (See Lucas Report at 7.)

In addition, although reference materials and a lab-wide quality assurance manual were available, there was no lab policies and procedures manual.  (Keith Dep. at 25).  Chemists were not required to attend particular conferences or courses after their initial training, and "qualifying statements" describing the limits of hair analysis were not required in reports finding associated hairs (despite the FBI's use of such statements).  However, the City's 1983 personnel policies specifically identified the giving of false, incomplete, or

---

[3]  "Peer review" (or "technical review") is a quality assurance practice that involves another forensic scientist reviewing the notes, data, and other documents that form the basis for a scientific conclusion. (Lucas Report at 6.)  A "verification" means another qualified examiner examined the actual items.  (Id. at 7.)

Peer review was an accreditation requirement of the American Society of Crime Laboratory Directors/Laboratory Accreditation Board in 1982.  (Id. at 6.)   According to Plaintiff's expert, verification also "was . . . quite common practice in many if not most forensic labs . . . for positive comparisons in the subjective examinations such as hair, latent prints, bullets/cartridges, [and] toolmarks . . . ."  (Id. at 7.)

[4]  At some point, the City began purchasing proficiency tests, but they were never used.

incorrect statement as grounds for dismissal or disciplinary action.  In 1984, several police officers were fired because of their role in falsifying a police report.

Like other members of the police department, Gilchrist was subject to annual performance reviews.  The forms used for forensic chemists were specific to their unique skill-requirements and responsibilities.  However, the sworn police officers who were in charge of her unit and the police lab generally did not have a scientific background or forensic science experience and rotated frequently (i.e., approximately every three years during Gilchrist's employment).  (Lucas Report at 2.)  For example, Captain Richard Delaughter, who was in charge of the lab in 1982 and 1983, had no such background or experience.  He "trusted" that the chemists were performing their duties correctly and that other chemists would alert him to any problems with a particular chemist's work. (DeLaughter Dep. at 17.)  When evaluating Gilchrist, he explained that he routinely rated her "fully competent" because she had the job and he saw her working.  (Id. at 24-40.)

Plaintiff has also produced evidence suggesting that, by 1986, members of the Oklahoma City Police Department were aware or should have been aware of serious problems with her analysis.  Plaintiff's expert, John T. Wilson, who was a forensic chemist with the Kansas City, Missouri, Police Department, examined evidence related to Gilchrist's hair analysis in three criminal cases before Plaintiff's.  In at least two of these cases, the reexamination occurred no later than March 1986.  Wilson found Gilchrist's analysis deficient and testified to that effect, as well as questioning Gilchrist's competency, during

the trial of Alvin Parker in February 1986.[5]  The Chief of Police was present during Wilson's

testimony.   It is also reasonable to assume, based on other evidence in the record and

Wilson's own report, that he took a position in the Curtis Edward McCarty case, in March

1986, that was highly critical of Gilchrist's hair analysis and possibly her serological analysis

as well.  That same month, two Oklahoma City Police Department investigators inquired of

Wilson's employer whether it permitted him to testify for the defense in criminal cases

outside the state and expressed concern that he was jeopardizing the case against McCarty.[6]

Despite this and subsequent criticisms of her, Gilchrist continued to receive positive

feedback and was promoted to a Senior Forensic Chemist Supervisor in 1990.  She had

operated as a de facto supervisor for some time previously.

DISCUSSION

---

[5]  With respect to the Parker case, Wilson explains:

> I reexamined numerous hairs reported by Joyce Gilchrist to be consistent with Mr.
> Parker.  As I testified at trial in February of 1986, many of the hairs were not useable
> for hair comparison, hairs identified as being forcefully removed had no root
> allowing such identification, some were misidentified as to body area and many were
> not microscopically similar to Mr. Parker, contrary to Ms. Gilchrist's testimony.  At
> the trial I presented photographic evidence of the unusable nature of the hairs
> examined by Ms. Gilchrist and the incorrect identification as to hair source and the
> lack of correspondence in the microscopic comparisons.

(Wilson Report, Sept. 27, 2006, at 3.)

[6]  In addition, the Oklahoma Employment Security Commission has noted, "The record
shows that on many occasions since at least 1984, claimant (Ms. Gilchrist) has been cited by the
courts for either failing to follow the court's orders, delaying in complying with court orders, or by
offering improper or inaccurate testimony."  (Okla. Employment Sec. Comm'n Dkt. No. 02-00975,
Order at 2.)  However, it is not clear on what evidence the Commission relied.
   An ethics complaint was also made against Gilchrist in February 1987.

The City requests summary judgement because: (1) there is no evidence of any underlying constitutional violation by Gilchrist; and (2) there is no evidence regarding a deficient training program or supervision by the City sufficient to support its liability. As indicated above, the City's first proposition has been largely rejected, with the exception that Plaintiff has failed to offer any argument or evidence in support of his allegation of Fifth and Eighth Amendment violations. Therefore, the City, like Gilchrist, is entitled to summary judgment on those claims. In addition, although the City appeared to argue that the Fourteenth Amendment claims are barred because of the existence of a state-law remedy, the City has clarified that it asserted that argument only against a procedural due process claim. (Dkt. No. 46, City's Reply at 7.) Plaintiff's Fourteenth Amendment claims are for substantive due process, and not procedural due process, violations. Therefore, that argument is not considered further. Accordingly, the City's first proposition fails.

The Court now turns to the second, regarding the purported lack of evidence to support municipal liability. A municipality is not liable for its employee's constitutional violation under a respondeat superior theory but must itself be responsible for the injury due to a policy or custom. See Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978); Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998). The municipality must be the "moving force" behind the injury, and a plaintiff seeking to impose § 1983 liability must show "the requisite degree of culpability" and "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bd. of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997). Even if there is no facially unconstitutional policy in place, a

municipality may be liable under § 1983 if its failure to train or supervise its police employees amounts to a deliberate indifference to the rights of the persons with whom those employees come into contact.  See City of Canton v. Harris, 489 U.S. 378, 388-89 (1989) (referring specifically to a failure to train).

Based on Plaintiff's response, the issue is whether he has offered enough evidence at summary judgment to reasonably support the inference that, in either its training and/or supervision of Gilchrist, the City was deliberately indifferent to the risk of constitutional violations as are complained of here.

A.      *Failure to Train*

A failure-to-train claim requires Plaintiff to first prove that the training program was inadequate and then that:  (1) Gilchrist's actions violated Plaintiff's constitutional rights; (2) the violation(s) occurred under circumstances that were usual and recurring situations for the City's forensic chemists; (3) the inadequate training demonstrates the City's deliberate indifference to potential criminal suspects; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.  See Carr v. Castle, 337 F.3d 1221, 1228 (10th Cir. 2003) (addressing Fourth Amendment excessive force claim).

In his response, Plaintiff makes repeated reference to expert and other evidence stating or suggesting that Gilchrist was incompetent as indicating a failure to train.  However, one chemist's incompetence, even if it is due to a failure to train, "will not alone suffice to fasten liability on the [C]ity," Harris, 489 U.S. at 390-91.  The constitutional violations may have resulted from Gilchrist's own shortcomings, or an otherwise sound training program may have been administered negligently with respect to her.  See id. at 391.  The Court's "focus must be on adequacy of the training program in relation to the tasks the [forensic chemists] must perform."  Id. at 390.  A "program" necessarily applies to the training given to multiple employees over time.  Brown, 520 U.S. at 407.

Defendant has produced evidence that Gilchrist's training addressed prominent issues in this case–namely, the limits of forensic scientific with respect to identifications based on hair analysis and the need for a City chemist to remain objective and provide truthful, scientifically accurate testimony and reports.  Plaintiff admits that Gilchrist attended the

courses identified and took notes and had in her office specific relevant manuals and instructions on these topics. Thus, a deficiency in the training program does not appear to be a failure to provide adequate information.[7]

Rather, liability for a failure to train would seemingly exist only as a failure to provide the necessary on-the-job training to perform the forensic analysis required. Although Plaintiff's response draws no clear distinction between instructional and skill training, his experts do. John Wilson states that the courses Gilchrist attended did not qualify her to work independently and that on-the-job training was required. (Wilson Report, Sept. 27, 2006, at 12.) According to Wilson, the current minimum guidelines to be qualified as a *hair examiner* is one year of full time training. (Id.) He contends further that "[i]t is simply not possible to become fully trained in forensic hair comparisons in 12 months through on-the-job-training while working other cases and being trained in other areas." (Id.) Douglas Lucas, another expert, explains that the current guidelines "simply codified what had been standard practice for many years" (Lucas Report at 12 n.32) and that "[i]n the 1980s, many if not most forensic laboratories had training programs for *serology and hair/fibre* [sic] *examiners* that were typically one to two years in duration" (id. at 12) (emphasis added).

Although Gilchrist's training period was for nine months and involved mentoring by a more senior and experienced chemist, the jury could find, based on the expert evidence

---

[7]   Neither side has identified specific training materials or instructions with regard to serological analysis. However, in the absence of other evidence suggesting the information conveyed was inaccurate or improper, the identification of courses related to the examination and analysis of blood and bodily fluids is sufficient to show that the training on those topics was adequate as well.

identified, that the City's training program fell short of prevailing standards and therefore was inadequate.  However, even if the training program for new chemists was inadequate in this respect, Plaintiff cannot survive summary judgment.

The evidence, construed in Plaintiff's favor, does not support a finding of deliberate indifference.  Deliberate indifference may be shown by a municipality's failure to act (1) despite actual or constructive notice of a pattern of tortious conduct and when that failure is substantially certain to result in a constitutional violation; or (2) absent a pattern of unconstitutional behavior, when the violation is "a highly predictable or plainly obvious consequence of a municipality's action or inaction."  Castle, 337 F.3d at 1229.  Allen v. Muskogee, 119 F.3d 837 (10th Cir. 1997) provides an often cited example of the latter. There, summary judgment was not warranted because the evidence indicated that the city trained its police officers to leave cover and approach armed suicidal persons to try to disarm them and that such training was reckless and contrary to what police throughout the country were trained to do.  119 F.3d at 843-44.  Thus, the evidence supported the "inference that the need for different training was so obvious and the inadequacy so likely to result in violation of constitutional rights that the policymakers of the [c]ity could reasonably be said to have been deliberately indifferent to the need."  Id. at 844.

Neither method of showing deliberate indifference is supported by the evidence presented.  Plaintiff has not identified any evidence suggesting that, with the exception of Gilchrist, the City's forensic chemists were incompetent or otherwise deficient in performing

their jobs.  Thus, the City could not have been on notice of a pattern of tortious conduct when

it hired and first trained Gilchrist.

In addition, the difference between the on-the-job training Gilchrist received and the

national practice is insufficient to support an inference that the City consciously chose to

disregard the risk of harm.  Generally, the failure to train forensic chemists may pose obvious

and grave risks to the rights of persons investigated.  However, a comparison of the City's

training and the standards described does not suggest an obvious need for a longer, more

involved on-the-job training existed.  There is also no suggestion that Gilchrist's mentor

should have recognized that Gilchrist was not capable of working independently when the

training period ended.  Thus, unlike <u>Allen</u>, the evidence does not support the inference that

the City's training was reckless, grossly "out of synch with the rest of the police profession"

or forensic labs, or itself created a high risk of falsely inculpatory scientific evidence being

generated in criminal investigations and used in prosecutions and the accurate, exculpatory

analysis being withheld.  <u>See id.</u> at 844.  At most, the evidence would support a finding that

the City was negligent in its initial training of Gilchrist.[8]

In sum, the evidence regarding Gilchrist's initial training does not suggest that the

City made a conscious training choice that evidenced a deliberate indifference to the rights

_____

[8] In addition, Plaintiff's failure-to-train claim suffers from causation problems.  At most, Gilchrist's on-the-job training did not allow her enough of an opportunity to gain the experience to work independently.  There is no evidence that she was trained to analyze incorrectly.  Thus, the connection between her initial training and the violation of Plaintiff's rights is far more tenuous than it was in <u>Allen</u>, where the officers were trained to do exactly the wrong thing rather than simply being unsure of how to react because of a lack of relevant training.  119 F.3d at 844.

of criminal suspects.  Instead, the City's potential liability will depend on proof of its failure to supervise and control Gilchrist after she completed the training program.[9]

B.      *Supervision and Control*

To survive summary judgment on a failure to supervise theory of liability, Plaintiff must identify evidence tending to show the same deliberate indifference and direct causation as required in the failure to train context.  Estate of Smith v. Silvas, 414 F. Supp. 2d 1015, 1019 (D. Colo. 2006) (citing Sutton ex rel. Sutton v. Utah State Sch. for the Deaf and Blind, 173 F.3d 1226, 1240 (10th Cir. 1999); Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993)).  The Court finds that he has carried that burden.

There is evidence that, after the training period ended, the City took almost no action to monitor her case work and made no attempt to control her communications with those outside of the lab, including detectives and prosecutors.  Experts have explained that a different command structure and the implementation of certain control procedures, such as reviews that actually assessed a chemist's skill and performance and peer review, were recognized in the early 1980s and would have better enabled the City to identify and/or prevent errors.  Given that the evidence indicates Gilchrist made repeated errors in her early case work and testimony, there were repeated opportunities for the City to have identified and corrected errors that the City simply missed.  Taken together, the evidence suggests that,

---

[9] Although Plaintiff's evidence will not support liability based on Gilchrist's initial training, there is clearly a failure-to-train aspect in the City's subsequent supervision and control of her that the Court does not mean to preclude.

even by 1986 standards, the City's supervision and control of scientists working in the police lab was inadequate and, quite possibly, reckless.[10]

Plaintiff's evidence also tends to show that the City was deliberately indifferent to the risks of allowing a forensic chemist with a checkered track-record to function virtually unsupervised.  As explained in the failure-to-train context, deliberate indifference may be shown by a municipality's failure to act despite having notice of a pattern of tortious conduct or because repeat constitutional violations are highly predictable.  Castle, 337 F.3d at 1229. Plaintiff has identified evidence that by 1986 the Police Department had been alerted to serious deficiencies in Gilchrist's analysis and questions about her professionalism, in more than one case, but took no action in response.  Instead, Gilchrist continued to receive "fully competent" and better in her reviews.[11]  Based on Wilson's involvement in earlier cases, the complaints about Gilchrist's work clearly implicated constitutional rights.  Further, based on the concern voiced by members of the Oklahoma Police Department in March 1986 about Wilson acting as rebuttal expert, the jury might also find that the City was actively attempting to discourage complaints about Gilchrist.  Under these circumstances, the jury could find that it was substantially certain that Gilchrist would continue to act in a similar

---

[10]  As already explained, there is evidence that could support a jury finding that Gilchrist violated Plaintiff's constitutional rights.  There is also no dispute that the alleged violations occurred under circumstances that were usual and recurring situations for the City's forensic chemists.

[11]  She also received a promotion in 1990, even though the criticism of her had increased and become more public after 1986.

manner in the future and the City consciously choose to take no ameliorative or preventative action.

Finally, whether the deficiencies in the City's supervision and control of its forensic chemists and Gilchrist in particular are directly linked to Plaintiff's injuries should be decided by the jury. Plaintiff claims that he was seized and deprived of his liberty without due process of law due to Gilchrist's fabrication of evidence against him. The failure to enforce the safeguards in place (e.g., peer review and meaningful annual evaluations) or to otherwise supervise Gilchrist's actions may be considered "closely related" to those injuries. Moreover, the jury could find that these failures led directly to the fabrication of evidence in Plaintiff's case. At a minimum, there was no apparent operational mechanism to thwart the reckless analysis of a forensic chemist or the harmful conclusions such action generates. This was the case even though Gilchrist had been accused of errors and ethical lapses in more than one instance before the investigation and prosecution of Plaintiff began. Plaintiff clearly has not identified evidence that the City literally instructed Gilchrist to fabricate evidence. But the evidence, when construed in his favor, tends to show the existence of an atmosphere of toleration, if not implicit endorsement of such conduct, by the City's continued positive treatment of Gilchrist despite institutional knowledge of allegations that she distorted/fabricated scientific evidence in prior cases.[12]

_____

[12] The City repeatedly questions how it could have known that anything was amiss when courts continued to recognize Gilchrist as an expert and no other entity issued sanctions. Although it is possible that the jury could agree with the City, it is also possible that the jury might credit other evidence suggesting that the City remained deliberately and willfully ignorant. Further, the City's contention is disingenuous to the extent that the City suggests that it, Gilchrist's employer, was in

For these reasons, the Court holds that there is sufficient evidence at summary judgment from which to infer that the City's failure to supervise and control forensic chemists amounted to a municipal policy or custom that was responsible for Plaintiff's injuries.

CONCLUSION

Accordingly, the City's motion for summary judgment (Dkt. No. 30) is DENIED in part and GRANTED in part. Summary judgment is granted in Gilchrist's favor on Plaintiff's Fifth and Eighth Amendment claims. Plaintiff has failed to provide evidence to support its claim that the City's training program was inadequate but may proceed against the City on the theory that its failure to supervise and/or control Gilchrist evidenced deliberate indifference to the rights of suspects in the cases she investigated.

IT IS SO ORDERED this 18th day of January, 2007.

ROBIN J. CAUTHRON
United States District Judge

---

no better position to discover the truth than institutions that did not have such a direct relationship with her.